CITY OF GRAFTON, a municipal corpo-
ration, Complainant and Appellant,

v.

OTTER TAIL POWER COMPANY of Fer-
gus Falls, Minnesota, Respondent
and Appellee,

Board of Administration of the State of
North Dakota, Intervenor and
Appellee,

No. 7709.

Supreme Court of North Dakota.

Oct. 25, 1957.

Rehearing Denied Dec. 4, 1957.

Robert E. Dahl, Grafton, and Gallagher & Paul, Mandan, for appellant.

Lynn G. Grimson, Grafton, and Field, Arvesen & Donoho, Fergus Falls, Minn., for appellee Otter Tail Power Co:

Leslie R. Burgum, Atty. Gen., and John E. Adams, Asst. Atty. Gen., for appellee Board of Administration.

Gerald G. Glaser, Bismarck, for Public Service Commission.

MORRIS, Judge.

Under date of March 31, 1955 the Otter Tail Power Company and the Board of Administration of the State of North Dakota entered into an agreement whereby the company agreed to furnish certain electric service to the State School at Grafton. The State School already had its own generating plant which furnished most of the electric energy normally needed by the School. The Board of Administration desired to provide standby electric service to be used in event of a breakdown or when steam boilers of the school generating plant were not in operation, and the State School being a possible preference user of electrical energy produced by the Federal Generating Plant at the Garrison Dam on the Missouri River, the Board desired to make arrangements for the transmission of such energy, such transmission being known as "wheeling service." The agreement provides for the furnishing of "wheeling service" and supplemental and emergency service by the company.

The grounds on which the school is located are on the west edge of the City of Grafton, the west boundary of the grounds being coincident with the western limits of the city. This boundary is formed by a section line. Along this section line is the usual section line township road. The city limits of Grafton were extended to include the school grounds in 1911. In 1926 the company constructed a transmission line running north and south on the west edge of the section line road. Thus the road lies between the transmission line and the grounds of the school.

The service agreed to be furnished by the company is to be rendered at the company's transmission line. The Board of Administration agreed to construct a substation at the school and build a transmission line from it to the company's transmission line on the west side of the road, a distance of approximately one-fourth mile, and to install suitable metering equipment. The company agreed to make such changes in its transmission line as were necessary to provide a suitable structure on which the line from the school could be connected to the company's line and the company was to receive $1,030 to compensate it for making these changes in its facilities. It was also provided that:

"this agreement shall be of no force and effect unless and until it has been approved by the Public Service Commission of the State of North Dakota."

The agreement bears the approval of the Public Service Commission under date of April 27, 1955.

For several years prior to the commencement of these proceedings the City of Grafton, through its municipal light plant, had provided some electric energy for use at the State School, and at the time of the hearing of these proceedings before the Commission was engaged in enlarging its plant with the result that it will be able to provide for the school's maximum requirements for light and power.

During the early part of June, 1955 the City of Grafton filed a complaint against the Otter Tail Power Company with the Public Service Commission of the State of North Dakota wherein it sought an order requiring the Otter Tail Power Company to cease and desist from supplying or offering to supply electric power to the Grafton State School or any other person, firm, corporation or public institution situated within the corporate limits of the city. The Public Service Commission set July 14, 1955 at the Court House in Grafton as the time and place for hearing the complaint on its

merits and notified the company accordingly.

The Otter Tail Power Company answered the complaint of the City of Grafton, set up its agreement with the Board of Administration and alleged that:

"pursuant to the terms of said agreement, the Board of Administration constructed, paid for, and owns the necessary substation, metering equipment, and lines to obtain electrical service, as provided therein, at a point of connection with Respondent's 41.6 KV transmission line located outside of the corporate limits of the City of Grafton. The physical connection has been made, and the Board of Administration is receiving service pursuant to said agreement. The Board of Administration has made a substantial investment in lines, substation, meters, and equipment under said agreement."

The company asked that the Board of Administration be made a party to this proceeding and that the complaint be dismissed. A hearing was had which resulted in an order of the Commission dated November 3, 1955 directing the company to cease and desist from furnishing either firm or emergency standby service to the Grafton State School on and after December 1, 1955.

The Board of Administration appeared orally at the hearing by its president and by mutual consent was made a party to this proceeding. Both the Board and the company appealed from the cease and desist order of the Commission to the District Court of Walsh County under the provisions of Chapter 28–32, NDRC 1943, being the Administrative Agencies Uniform Practice Act. After a trial in the District Court judgment was entered reversing the order of the Public Service Commission and remanding the case with instructions to dismiss the complaint and the proceedings thereon. From that judgment the City of Grafton appeals to the Supreme Court.

The appellant has set out twelve assignments of error, challenging certain findings of fact and legal conclusions of the trial court. They need not be set out here in detail. Their substance will be covered in our discussion of controlling points of controversy.

In 1904 an amendment to the State Constitution, Section 215, was adopted, providing that:

"there shall be located at or near the city of Grafton, in the county of Walsh, an institution for the feeble minded, on the grounds purchased by the secretary of the interior for a penitentiary building."

Chapter 108, Session Laws N.D. 1903 was an act "to establish an Institution for the Feeble Minded and to Provide for its Support and Management." The institution was placed under the control of a board of five trustees appointed by the governor with the advice and consent of the senate. Chapter 62, Session Laws N.D. 1911 created a Board of Control which was given full power to manage, control and govern, subject to certain limitations contained in the act, various state institutions including the School for the Feeble Minded. Chapter 71, Session Laws N.D. 1919 created the Board of Administration and transferred to it all of the powers and duties of the State Board of Education, State Board of Regents and the State Board of Control. Chapter 240, Session Laws N.D. 1933 changed the name of the institution for the feeble minded to "Grafton State School." At the time this controversy arose Section 25–0102, NDRC 1943 provided that the Board of Administration should have general control and management of the State School. The general power of the Board of Administration to provide electric service for the State School is not challenged in this proceeding, but it is contended by the City of Grafton that the power of the Board to purchase electric light and power for the Grafton State School is limited in two respects. The first contention is that the Board can only contract with public utility corporations in accordance with the

statutes and the rules and regulations of the Public Service Commission with respect to the regulation of public utility corporations and that the sale and delivery of electrical energy to the Board of Administration at the point outside of the City of Grafton for the purpose of being conveyed over the power line of the Board to the School within the limits of the city is violative of those statutes and rules. The second contention is that the construction and maintenance by the Board of its power line across the section line road which in part bounds the City on the west is a violation of Section 139 of the North Dakota Constitution and that the Public Service Commission may properly direct the Otter Tail Power Company to cease and desist from furnishing to the Board electricity to be conveyed over the line thus erected and maintained in contravention of the constitutional powers of the City.

The Grafton State School is a state institution whose foundation rests upon Section 215 of the North Dakota Constitution. Its creation and establishment were brought about by legislative enactment. The Board of Administration is an agency of the state created for the purpose of administering and managing the School and other specified institutions. It has the powers vested in it by statute either expressly or by reasonable implication. When exercising those powers it is acting as an instrumentality of the state. Neither the Board nor the Grafton State School is a legal entity separate and apart from the State. The property constituting the school plant and that incident to its operation is the property of the State.

State ex rel. Board of University and School Lands v. McMillan, 12 N.D. 280, 96 N.W. 310, 316, involved the constitutionality of an act authorizing the Board of Trustees of the State Normal Schools to issue bonds to provide a fund for the erection and equipment of buildings and other necessary improvements for the normal schools at Valley City and Mayville. A test was made of the validity of bonds issued by the Board of Trustees, one of the predecessors of our present Board of Administration, for the State Normal School at Valley City. In holding the bonds invalid this court said:

"This institution is not a school corporation or a legal entity. It cannot levy and collect taxes; it owns no property; its trustees cannot contract debts except within the limits of the appropriations made by the Legislature for its support; and when such debts are contracted they are not debts of the institution, but are the debts of the state. The state is charged with its support and maintenance as one of the educational institutions of the state. This institution and the other state educational and charitable institutions are not legal and independent entities, but are mere agencies or instrumentalities through which the state promotes its educational and charitable interests, and for the support of which all of the taxable property of the state is chargeable; and the power of their trustees to contract debts is limited by legislative appropriations."

In State ex rel. Kaufman v. Davis, 59 N.D. 191, 229 N.W. 105, 111, the court had before it a legislative act authorizing the organization of nonprofit sharing institutional holding associations to build and operate dormitories at certain educational institutions. The test in that case came upon the granting of a permit for the erection of a dormitory on the campus of the Agricultural College. In upholding the constitutionality of the act the court said:

"The obvious purpose of section 152 of the Constitution was to secure to and to retain in the state absolute and exclusive control of any and all of the educational institutions receiving support from the land grants, or support by public taxation, and to prevent any of such institutions from ever being placed under the control of any private person

or organization. There can be no doubt that this constitutional provision inhibits the Legislature from, in any manner or under any guise whatsoever, transferring the control of any of the state educational institutions to any degree whatsoever to any person or organization, but that such control must remain absolutely and exclusively in the state itself. * * * The intention of the Legislature, as evidenced by the act, is that the state at no time shall lose control over the property. It is always under the control and supervision of the administrative board created by the state to exercise supervision and control over its higher institutions of learning."

■ The Public Service Commission is a constitutional body. The election of its members is provided by Section 82 of the North Dakota Constitution. It was originally known as the Board of Railroad Commissioners. The powers and duties of its members are such as are prescribed by law. Section 83, North Dakota Constitution. The Public Service Commission has only such powers as have been conferred upon it by the Legislature. It can initiate no public policies of its own. It can act in no field which the Legislature has not authorized it to enter. Chrysler Light & Power Co. v. City of Belfield, 58 N.D. 33, 224 N.W. 871, 63 A.L.R. 1337. Williams Electric Cooperative, Inc., v. Montana-Dakota Utilities Co., N.D., 79 N.W.2d 508; Monroe v. Railroad Commission, 170 Wis. 180, 174 N.W. 450, 9 A.L.R. 1007; 42 Am.Jur.Public Administrative Law, Sec. 26.

"A state may distribute its powers as it sees fit, provided only that it acts consistently with the essential demands of due process and does not transgress those restrictions of the Federal Constitution which are applicable to State authority." Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 295, 76 L.Ed. 598.

The state is also subject to the self-imposed limitations of its own Constitution. Our Constitution has authorized the Legislature to prescribe the powers and duties of the Public Service Commission and the Legislature has acted accordingly.

■ ■ Chapter 192, Session Laws N.D. 1919 was a comprehensive act defining public utilities and authorizing the Board of Railroad Commissioners to regulate, control and fix charges and rates of such utilities. This act forms the basis of much of our present statutory law authorizing the regulation of public utilities by the Public Service Commission. Section 23 of that act provided:

"Nothing in this Act shall authorize the Commissioners to make any order affecting rates, tolls or charges, contracts, or services rendered or the safety, adequacy, sufficiency of facilities, or the rules or regulations of any public utility owned and operated by the State, city, county, township, town or village or any other political subdivision of the State, or any public utility that is not operated for profit, but all other provisions herein shall apply to such utilities."

This Section now appears as Section 49-0213, NDRC 1943. It indicates an intention on the part of the Legislature to, in a large measure, withhold from the Public Service Commission jurisdiction and authority over public utilities owned and operated by the state.

It may be noted that the electric power plant of the Grafton State School and the power line erected by the Board of Administration extending to the line of the Otter Tail Power Company beyond the city limits is not a public utility but is only a plant and a line providing electric service for the exclusive use of the Grafton State School. We think, however, that the statute has some bearing as indicating a policy on the part of the Legislature to withhold from the Public Service Commission authority to control the production, transmission and use of electric power by the sov-

ereign state of North Dakota and its political subdivisions.

Chrysler Light & Power Co. v. City of Belfield, 58 N.D. 33, 224 N.W. 871, 872, 63 A.L.R. 1337, involved the question of whether or not the Board of Railroad Commissioners had the power to fix the rates to be charged by a private light and power company for lighting the city streets where those rates had been fixed by the franchise under which the company did business in the city, and it was held:

"The power to regulate such rates is conferred upon the board of railroad commissioners by chapter 192, Laws 1919, commonly known as the Public Utilities Act. Following Western Electric Co. v. City of Jamestown, 47 N.D. 157, 181 N.W. 363, it is held that such act does not confer upon the board of railroad commissioners power to interfere in any manner with rates for electric current to be furnished by an electric light company to a city for the lighting of its streets, where such rate is fixed by contract in the franchise granted by the city to the electric light company."

Sutherland Statutory Construction, 3rd Ed., Sec. 6301, states:

"General words or language of a statute that tends to injuriously encroach upon the affairs of the government receive a strict interpretation favorable to the public, and, in the absence of express provision or necessary implication, the sovereign remains unaffected."

■ Here we have a state agency that is clearly designed to regulate privately owned utilities for the benefit and protection of the public welfare. On the other hand we have an agency of the state to which has been assigned the duty of managing and operating certain charitable institutions, and as an incident to that management and operation has control of property of the state reasonably necessary for the operation of those institutions. We find no provisions of the law which vest in the Public Service Commission power to interfere with the lawful conduct of the Board of Administration including the making and carrying out of contracts for the purchase of commodities reasonably necessary for the operation of the institutions under its control. Such a commodity is light and power.

It is argued that although the Public Service Commission may not exercise control over the Board of Administration, it nevertheless does have power to regulate the conduct of the Otter Tail Power Company to the extent of directing it to cease and desist from furnishing power to the Board of Administration to be conveyed into the City of Grafton which has its own municipal plant. In support of this contention the appellant, City of Grafton, cites Incorporated Town of Ackley v. Central States Electric Co., 204 Iowa 1246, 214 N.W. 879, 54 A.L.R. 474; Holston River Electric Company v. Hydro Electric Corp., 17 Tenn.App. 122, 66 S.W.2d 217, and Attorney General ex rel. Board of Commissioners v. Walworth Light & Power Co., 157 Mass. 86, 31 N.E. 482, 16 L.R.A. 398. These cases hold that an injunction will lie to restrain an electric light and power company from furnishing electricity to private users for transmission by such users over their private lines into a municipality in which another company holds an exclusive franchise. That is not the situation here.

■■ The city does not hold an exclusive franchise as against the state by virtue of any legislative act. Section 40–0501, NDRC 1943, paragraph 67, gives municipalities power "To purchase, acquire by eminent domain, erect, lease, rent, manage, and maintain electric light and power plants, gas works, steam heating plants and appurtenances for distribution, and to regulate and fix the rates to its patrons." (This statute was amended by Chapter 259, Session Laws N.D. 1955 in a manner not pertinent to this controversy.) The power

thus bestowed upon the city is not in derogation of the sovereign power of the state to support, maintain and manage its charitable institutions in the manner that its chosen board deems most efficient and for the best interest of the public of the state at large. See Yancey v. North Carolina State Highway and Public Works Commission, 222 N.C. 106, 22 S.E.2d 256; American Legion Post No. 279 v. Barrett, 371 Ill. 78, 20 N.E.2d 45; State of California v. Brotherhood of Railroad Trainmen, 37 Cal.2d 412, 232 P.2d 857; Nutter v. City of Santa Monica, 74 Cal.App.2d 292, 168 P.2d 741; State v. City of Milwaukee, 145 Wis. 131, 129 N.W. 1101, Ann.Cas.1912A, 1212, 1214. We reach the conclusion that neither the statutory powers and jurisdiction over public utilities conferred on the Public Service Commission nor the powers vested in municipalities to own and operate electric light and power plants derogate the state's sovereign powers to manage, maintain and operate its charitable institutions whether they be located within or without the limits of a municipality.

The city contends that the part of the section line road lying east of the section line which bounds the grounds of the State School on the west constitutes a street or highway over which the City authorities have control, and that the Board of Administration has no right to construct, operate or maintain its highline over that portion of the road without the consent of the city authorities. In support of this contention it cites Section 139 of the N.D. Constitution which provides:

> "No law shall be passed by the legislative assembly granting the right to construct and operate a street railroad, telegraph, telephone or electric light plant within any city, town or incorporated village, without requiring the consent of the local authorities having the control of the street or highway proposed to be occupied for such purposes."

While the record in this case is not too clear with respect to the control of a part of the road by the city, we will assume for the purposes of this discussion that the city has the same control over the part of the highway that lies east of the section line as it does over a city street and go directly to the question of whether the city has the right to control the use of the highway as against the state acting through an agency exercising governmental powers.

██ Section 130 of the N.D. Constitution directs the legislative assembly to provide by general law for the organization of municipal corporations. This court has held that cities are merely agencies of the State exercising and holding powers and privileges subject to the sovereign will. State ex rel. City of Minot v. Gronna, 79 N.D. 673, 59 N.W.2d 514; City of Fargo v. Sathre, 76 N.D. 341, 36 N.W.2d 39. A city in granting a franchise to a public utility acts as agent for the State. McQuillin, Municipal Corporations, 3rd Ed., Sec. 34.10. The power to grant franchises to use the streets of a municipality resides primarily in the legislature which has the power to grant to a utility the right to use the streets and highways of a municipality without its consent unless the State Constitution requires that such consent be obtained. McQuillin, Municipal Corporations, 3rd Ed., Sec. 34.13. Section 139 of the Constitution clearly requires that such consent be obtained for the use of streets for the enumerated purposes by private persons or corporations. Recourse to the debates and journal of the Constitutional Convention of the State discloses that the framers of the Constitution treated municipal corporations as being in one category and other corporations were treated as being in another category. In providing initial drafts of the Constitution, Article VI embracing municipal corporations was assigned to one committee, and Article VII pertaining to "corporations other than municipal" was assigned to another committee. When the final draft of the Constitution

was adopted, Article VI consisted only of Section 130. That section vests no constitutional powers in municipal corporations. Article VII consists of Sections 131 to 146 inclusive, and contains various provisions with regard to corporations other than municipal. Section 144 provides:

"The term 'corporation', as used in this article, shall not be understood as embracing municipalities or political divisions of the state unless otherwise expressly stated, * * *"

Section 139 of the Constitution is not a grant of power to municipalities but a restriction upon the legislature designed to prevent it from authorizing indiscriminate use of the streets of a municipality by certain enumerated public utilities without control by the local authorities. To that extent it is a limitation upon the sovereign power of the state. We cannot read into this section, however, a restriction upon the state itself to use for governmental purposes the streets and highways of the municipality. Such a restriction is clearly a matter which the framers of the Constitution did not have in mind when they proposed Section 139 as a part of the Article dealing with corporations other than municipal. It is therefore our conclusion that Section 139 of the Constitution has no bearing upon this controversy. It affords no reason or basis for the order of the Public Service Commission directing the Otter Tail Power Company to cease and desist from furnishing to the State Board of Administration electrical power for transmission over the streets or highways of the City of Grafton.

The city further argues that in some way the action of the Board of Administration violates a contract between the State and the City of Grafton because the City has seen fit to construct and operate its own electrical plant and through this action has assumed a franchise privilege. A number of cases are cited bearing upon the impairment of contracts created by franchises issued by cities to private companies. These cases are not in point. The city operates its light plant pursuant to authority vested in it by the legislature under Section 40–0501, NDRC 1943 to which we have heretofore referred. This statute does not as against the State grant to the City an exclusive franchise. But even if the city was operating its plant pursuant to a contract with the State, the enforcement of that contract would not be either directly or indirectly within the jurisdiction of the Public Service Commission and the Commission would have no power to issue orders with respect to its enforcement. Williams Electric Cooperative, Inc., v. Montana-Dakota Utilities Co., N.D., 79 N.W.2d 508.

The order of the Public Service Commission of November 3, 1955 was beyond the power of the Commission to issue and the court properly directed the dismissal of the proceedings.

The judgment appealed from is affirmed.

BURKE, JOHNSON and SATHRE, JJ., and JOHN SAD, District Judge, concur.

GRIMSON, C. J., deeming himself disqualified, did not participate; Honorable JOHN SAD, Judge of the First Judicial District, sitting in his stead.