(No. 34886.—)

KELLOGG FAIRBANK *et al.,* Appellants, *vs.* WILLIAM G. STRATTON, Governor, *et al.,* Appellees.

*Opinion filed August 1, 1958—Rehearing denied Sept. 15, 1958.*

Winston, Strawn, Smith & Patterson, of Chicago, (Harold A. Smith, and Calvin Sawyier, of counsel, for appellant Kellogg Fairbank, and Watkins and Meyers, of Chicago, for additional appellant Ferre C. Watkins.

Latham Castle, Attorney General, of Springfield, and John C. Melaniphy, Corporation Counsel, of Chicago, and Thomas M. Thomas, George H. Dapples, and Thomas F. Scully, for appellees.

Mr. Justice House delivered the opinion of the court:

Plaintiffs, (Kellogg Fairbank, original plaintiff, later joined by additional plaintiff Ferre C. Watkins,) as taxpayers, seek to enjoin the purchase by the State Treasurer of a $25,000,000 revenue bond issue of the Metropolitan Fair and Exposition Authority. They further attempt to restrain the Authority from expending funds to reclaim submerged lands under a lease from the Chicago Park District. The defendants are William G. Stratton and Elmer G. Hoffman, as Governor and Treasurer, respectively, of the State of Illinois, and the Metropolitan Fair and Expo-

sition Authority and the individual members of its board. The circuit court of Cook County, after a hearing dismissed the cause and entered a decree for the defendants. The plaintiffs perfected separate appeals to this court.

The Metropolitan Fair and Exposition Authority Act (Ill. Rev. Stat. 1957, chap. 34, pars. 155g1 *et seq.*:) created the Metropolitan Fair and Exposition Authority, a municipal corporation. The Authority is empowered thereunder to acquire, construct and maintain fair and exposition grounds and facilities, to issue revenue bonds and to charge for the use of such facilities when built. It also is given the right to accept from Chicago Park Fair any funds theretofore received from the Fair and Exposition Fund (Ill. Rev. Stat. 1957, chap. 127, pars. 142i and 164,) and to receive such additional sums as may be distributed to it from that fund in the future.

The Authority proposes to build an exposition building and auditorium upon a tract of 32.37 acres in Burnham Park at Twenty-third Street in the city of Chicago. Under the terms of the lease from the Chicago Park District, 6.49 acres of the demised tract, which is presently submerged, must be filled by the Authority in order to perfect its lease. The cost of reclamation and construction is to be financed by the issuance and sale of revenue bonds in the principal sum of $25,000,000, to be amortized over a period of 33 years from revenues derived from operation of the facilities. The Authority is authorized to service such bond issue in part with distributions from the State Fair and Exposition Fund and may accept funds derived from sources other than operational revenues.

The Authority offered the bonds for sale to the public, the offer providing that bids would be received until 11 o'clock of the morning of February 3, 1958. This action was commenced 10 days prior to the last day for taking bids, and there were no bids tendered.

While there is no firm commitment or contract, the

State Treasurer contemplated the purchase of this issue of bonds with public funds in his custody, by and with the consent of the Governor. He could go no further than express an intention, since this litigation was instituted prior to the date of sale. The proposed purchase is the primary target of the original plaintiff's attack based upon the assertion that the bonds are practically worthless and unmarketable, and so unsafe as to constitute an improper and imprudent investment of public funds. The bulk of the evidence was on this point, although some testimony involved collateral issues which are primarily questions of law.

The hearing below took approximately six weeks with a resultant extremely long record. Much evidence, both oral and documentary, was introduced on the question of the accuracy and reliability of the projection of revenues which might be expected from the operation of the facilities and the amount which could be expected from the Fair and Exposition Fund. Changes have been made in the plans from time to time to increase the floor space available for rental purposes. From the evidence plaintiffs draw the conclusion that the bonds are unsecured and unmarketable, that they involve a speculative risk in a venture having no past history, and that these bonds are *per se* an improper investment by the State Treasurer.

The Treasurer is a constitutional officer, and neither the legislature nor the courts can deprive him of his constitutional powers, nor can they relieve him of his responsibilities. (*American Legion Post No. 279* v. *Barrett*, 371 Ill. 78; *People ex rel. Nelson* v. *West Englewood Trust and Savings Bank*, 353 Ill. 451.) Plaintiffs assert that the proposed purchase would constitute speculation with public funds and be in violation of the Treasurer's constitutional duty of safekeeping public funds. It is rightly contended that the Treasurer is a fiduciary and, as such, an insurer or trustee of the public funds in his custody. His duty

stems from the constitution and the nature of the office of Treasurer provided for therein. (*American Legion Post No. 279* v. *Barrett*, 371 Ill. 78.) On the other hand, he is a constitutional officer with discretionary powers and cannot be deprived of his stewardship. (*People ex rel. Nelson* v. *West Englewood Trust and Savings Bank*, 353 Ill. 451.) In the absence of fraud, corruption, oppression or gross injustice, and none has been charged or shown in this case, the courts will not interfere to control the discretionary powers of the Treasurer. *Boyden* v. *Department of Public Works*, 349 Ill. 363; *Stewart* v. *Department of Public Works*, 336 Ill. 513.

At this point it seems appropriate to consider whether there exists statutory authority for the proposed purchase. Defendants rely upon two provisions of the statute. The first is section 22½ of the Deposit of State Moneys Act (Ill. Rev. Stat. 1957, chap. 130, par. 41a) which defines acceptable investments of surplus funds. The last paragraph of the section, added by amendment in 1955, reads in part as follows: "The State Treasurer may, with the approval of the Governor, invest or reinvest * * * any State money in the treasury which is not needed for current expenditures due or about to become due * * * in bonds issued by counties or municipal corporations of the State of Illinois."

The other is contained in the Metropolitan Fair and Exposition Authority Act. Section 12 thereof (Ill. Rev. Stat. 1957, chap. 34, par. 155g12) reads in part: "The State * * * banks, bankers, trust companies, savings banks and institutions * * * and all executors, administrators, guardians, trustees and other fiduciaries may legally invest any sinking funds, moneys or other funds belonging to them or within their control in any bonds issued pursuant to this Act, it being the purpose of this section to authorize the investment in such bonds of all sinking, insurance, retirement, compensation, pension and trust funds, whether owned or

controlled by private or public persons or officers; provided, however, that nothing contained in this section may be construed as relieving any person from any duty of exercising reasonable care in selecting securities for purchase or investment."

In our opinion there is ample statutory authority to purchase this type of bond. Section 12 of the Authority Act makes lawful the investment of State funds in bonds issued under such act, the only qualification being that the purchaser is not relieved of any duty of exercising reasonable care in the selection of securities. This qualification really adds nothing new since, as we pointed out above, the legislature cannot relieve the Treasurer of responsibility for funds coming into his hands, nor can it force the Treasurer to purchase any given issue of bonds. There can be no doubt of the legislative intent to permit the purchase of revenue bonds of this particular municipal corporation since section 12 specifically declares the Authority's bonds to be a legal investment for State and fiduciary funds, and the only type of securities it is authorized to issue is revenue bonds. It is unnecessary to pass upon the question of whether section 22½ (Ill. Rev. Stat. 1957, chap. 130, par. 41a) authorizes the purchase of revenue bonds in view of the provisions of section 12 of the Authority Act.

Plaintiffs interpret the "reasonable care" duty of section 12 to nullify the investment authority given therein, and assert that the fiduciary standard existing before its enactment must be met. They then develop the argument that the amplification-of-purpose clause in section 12 limits the investment to sinking and trust funds and the like, and, therefore, there is no authorization for the contemplated purchase. We cannot subscribe to this theory. The only reasonable interpretation of section 12 is that the General Assembly intended to emphasize the fact that sinking and trust funds were to be included, but not to the exclusion of "other funds belonging to them or within their control."

Plaintiffs contend that the bonds in question are *per se* not of a type acceptable for fiduciary investment, irrespective of the reliability of the revenue estimates, although apparently conceding that the Treasurer has the power to invest idle funds. The legislature had the power to, and did, make them available for fiduciary investment. Actually, each of plaintiffs' arguments in the final analysis comes to the question of whether these particular bonds are a sound, reasonable, and prudent investment. Thus, it will be seen that we are called upon to analyze the evidence and decide whether these bonds are a prudent and safe investment. For us to take such a course would, in effect, be the substitution of our judgment for the judgment of the Treasurer.

The evidence consists largely of expert opinions based on projections of probable earnings, costs of operation and other factors, and is in sharp conflict. The record does not bear out plaintiffs' flat and repeated statement that the bonds are worthless and totally unmarketable. It is true that no bids were received at the public offering, but that does not prove worthlessness. The fact that this litigation was commenced ten days prior to the date bids were to be opened could have been a factor in keeping bond buyers from tendering bids. Furthermore, in addition to expected operational revenues the Authority is presently receiving distribution from the Fair and Exposition Fund. We recognize that the distribution from that fund may not always continue, nor be on the same scale, but certainly it is a valuable factor to be considered and precludes the statement that the bonds are worthless. Parenthetically, we observe that present distributions therefrom are more than sufficient to meet the debt service.

Article III of the constitution provides for a separation of the powers of government between the legislative, executive and judicial branches, and neither is permitted to exercise the powers properly belonging to the other. Here, discretionary power is vested in the State Treasurer, and we

will not pass upon the wisdom or propriety of his executive act. (*People ex rel. Bruce* v. *Dunne*, 258 Ill. 441; *People ex rel. Woll* v. *Graber*, 394 Ill. 362.) In the absence of his proposed purchase being unconstitutional, we would be transgressing on his powers and substituting our judgment for legislative discretion, should we enjoin such purchase.

Plaintiffs seriously urge that the purchase of all or substantially all of this revenue issue would violate section 20 of article IV of the constitution which reads: "The state shall never pay, assume or become responsible for the debts or liabilities of, or in any manner give, loan or extend its credit to or in aid of any public or other corporation, association or individual." We have held that there was no violation of section 20 where an appropriation was made to counties for road purposes (*Martens* v. *Brady*, 264 Ill. 178), nor where the State paid a soldiers bonus (*Hagler* v. *Small*, 307 Ill. 460), nor where State funds were provided for the use of the housing authority (*Cremer* v. *Peoria Housing Authority*, 399 Ill. 579), nor the giving of State aid to the Armory Board (*Loomis* v. *Keehn*, 400 Ill. 337). Plaintiffs comment that the foregoing cases, and those of similar import, are concerned with legislative appropriations or conveyances and, therefore, not applicable here. This may be partially predicated upon the theory that there must be legislative approval by way of appropriation. A gift is not here involved, but legislative approval has been given for the purchase of these bonds, subject to the discretion of the Treasurer.

The transaction in question involves only a purchase or loan. There is a loan of State funds, not of State credit. The State is not undertaking to become a surety or guarantor of payment of the bonds. It would be in the position of a creditor, rather than that of a debtor which arises upon a loan of credit. We conclude that the provisions of section 20 of article IV of the constitution have no application with respect to the contemplated purchase.

Plaintiffs next contend that there are insufficient funds in the treasury to purchase the bonds. This is based upon their interpretation of the investment power of section 22½ of the Deposit of State Moneys Act (Ill. Rev. Stat. 1957, chap. 130, par. 41a,) being confined to unappropriated funds. The record shows that the unappropriated funds will be slightly in excess of $2,000,000 and that, therefore, there will be insufficient money in the treasury to make the purchase. It will be noted from section 22½ that the legislature did not restrict the investment to unappropriated State moneys but provided that the investment could be made from funds "not needed for current expenditures due or about to become due." The record further discloses that for a period of approximately 15 years the available cash balance in the general revenue fund has not been below $50,000,000 and ranges from that figure to $195,000,000. It seems obvious that if it had been the legislature's intent that investments could be made only from unappropriated balances, it would have used that language rather than the current expenditure phrase. Contrary to the history of a few decades ago, the State has many sources of revenue which are paid on a monthly basis. By the very nature of the present revenues, together with the historical background over 15 years, we cannot see that this purchase would violate the clear intent of the authorizing statute.

The contention that there was no *bona fide* offering of the bonds at a public sale is without merit, since the record affirmatively shows that the bond offering complied with the requirements of the statute. Evidence tending to show that syndicates are sometimes, or even usually, formed does not render invalid the offer of sale made in conformance with the authorizing act.

Plaintiffs assert that the lease from the Chicago Park District to the Authority is invalid upon the grounds: first, that the legislature had not granted the Authority the right to use submerged lands; and secondly, that the use of the

existing lands covered by the lease in Burnham Park at Twenty-third Street for convention hall purposes violates the conditions of an earlier act and a decree thereunder.

With reference to the first contention it appears that Chicago Park District leased 32.37 acres to the Authority for the purposes stated. The acceptance of a lease was authorized by section 5 of the Authority Act (Ill. Rev. Stat. 1957, chap. 34, par. 155g5(c)). The Park District was empowered, under section 1 of an authorizing act (Ill. Rev. Stat. 1957, chap. 105, par. 327v6), to grant a lease to the Metropolitan Fair and Exposition Authority of any parcel of land not exceeding 25 per cent of the total park area of such Park District with certain provisions relative to divestment of title and power to regulate. It is urged that the legislature has not shown by either act that it was the intention to permit the Authority to extend itself over submerged lands. Two other sections of the statute must also be considered. Section 1 of an enabling act (Ill. Rev. Stat. 1957, chap. 105, par. 92) authorizes the Park District to extend the park over and upon the bed of public waters, and section 4 thereof (Ill. Rev. Stat. 1957, chap. 105, par. 96) specifically provides that title to any such extension shall be vested in the park commissioners for public purposes and that lands reclaimed thereupon become part of the public park. The gist of this argument is that the Park District could presumably reclaim the submerged portion and then lease it, but that there is no statutory authority for the Park District to provide in a lease that the land be reclaimed at the expense of the Authority. True, the language does not expressly authorize this particular provision of the lease, but, in reading all of the provisions together, nothing appears to indicate a legislative intent that submerged land become a part of the Park District only if it is reclaimed by the district itself rather than through a lessee. The treatment of this problem is well stated by Mr. Justice Holmes in *Johnson* v. *United States*, 163 Fed.

30, 32: "A statute may indicate or require as its justification a change in the policy of the law, although it expresses that change only in the specific cases most likely to occur to the mind. The Legislature has the power to decide what the policy of the law shall be, and if it has intimated its will, however indirectly, that will should be recognized and obeyed. The major premise of the conclusion expressed in a statute, the change of policy that induces the enactment, may not be set out in terms, but it is not an adequate discharge of duty for courts to say: We see what you are driving at, but you have not said it, and therefore we shall go on as before."

We are of the opinion that the Park District's title will become absolute after the reclamation, subject to the terms of the lease, and that a fair appraisal of the intent of the several acts authorizes the execution and acceptance of the lease.

The second argument on this point revolves around a 1907 act which authorized an agreement as to riparian rights by the South Park Commissioners, since succeeded by the Chicago Park District. Under that act, a boundary line agreement was entered into on March 30, 1912, whereby a line was fixed and the Illinois Central Railroad Company disclaimed any interest in the area east of the boundary line, which agreement was judicially confirmed for park purposes. Plaintiffs say that the use of this tract is not for park purposes and consequently invalid. This argument would have merit if the property had been dedicated or restricted to a particular use or purpose (as in *City of Chicago* v. *Ward*, 169 Ill. 392; *Bliss* v. *Ward*, 198 Ill. 104; *Ward* v. *Field Museum*, 241 Ill. 496, and *South Park Comrs.* v. *Ward & Co.* 248 Ill. 299, known as the *Ward cases*, and similar cases). Burnham Park was not so dedicated and it is therefore within the province of the legislature to determine its use. The doctrine of legislative supremacy over municipal corporations is well stated in the

case of *People ex rel. Gutknecht* v. *City of Chicago,* 414 Ill. 600. It has been established that the property of such corporation is subject to the will of the legislature. This doctrine is not affected by the 1912 agreement since the agreement with the Illinois Central was largely in the nature of a quitclaim and did not constitute a dedication within the normal meaning of a park dedication.

We recognize that submerged lands reclaimed are impressed with a trust in the public interest. However, the facility here contemplated is in the public interest and has been approved by the proper authorities. Under circumstances such as these we find no violation of that trust. *Illinois Central Railroad Co.* v. *City of Chicago,* 173 Ill. 471; *Furlong* v. *South Park Commissioners,* 320 Ill. 507; *Bowes* v. *City of Chicago,* 3 Ill.2d 175.

Plaintiff Fairbank suggests that he was denied due process of law in that he was unduly rushed in the preparation and trial of this case. This may be answered technically by citing cases which hold that due process is satisfied with proper notice and an opportunity to be heard in an orderly proceeding. (*Chicago Land Clearance Commission* v. *Darrow,* 12 Ill.2d 365; *Benton* v. *Marr,* 364 Ill. 628; *People* v. *Niesman,* 356 Ill. 322.) Actually, the case was thoroughly prepared, well tried and argued on behalf of all parties. Permission was given, and accepted, to exceed the length of briefs authorized by our rules.

In conclusion, we are of the opinion that the Treasurer cannot be deprived of his discretionary power by the courts, and we find no unauthorized or unconstitutional action on the part of the Metropolitan Fair and Exposition Authority. The decree of the circuit court of Cook County is, therefore, affirmed.

*Decree affirmed.*